```
 1                    THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF TEXAS
 2                            HOUSTON DIVISION

 3
                                    )   No. H-10-CV-1904
 4   UNITED STATES OF               )
     AMERICA                        )   HOUSTON, TEXAS
 5      Plaintiff,                  )   November 22, 2010
                                    )   10:44 a.m.
 6      -vs-                        )
                                    )
 7   MR. THOMAS E. LIPAR;           )
     MR. JESSE VALERIANO;           )
 8   LIPAR GROUP, INC.; LGI         )
     LAND, LLC; LGI GP, LLC;        )
 9   LGI DEVELOPMENT; JTI           )
     CONTRACTORS, INC.; JTI         )
10   CONSTRUCTION, INC.;            )
        Defendants.                 )
11                                  )
                                    )
12   LISA P. JACKSON,               )
        Third-Party Defendant       )
13                                  )
                                    )
14   MR. THOMAS E. LIPAR;           )
     LGI LAND, LLC; LIPAR           )
15   GROUP, INC.; LGI GP,           )
     LLC;                           )
16      Counter Claimants,          )
                                    )
17      -vs-                        )
                                    )
18   UNITED STATES OF               )
     AMERICA, LISA JACKSON,         )
19      Counter Defendants.         )

20

21

22           TRANSCRIPT OF TELEPHONE CONFERENCE
              BEFORE THE HONORABLE LYNN N. HUGHES
23

24     OFFICIAL COURT REPORTER:  JEANETTE C. BYERS, RPR, CSR
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPH,
25     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

2

```
 1   A P P E A R A N C E S:
 2
     FOR UNITED STATES and JACKSON:
 3     U.S. Department of Justice
       BY:   MICHAEL D. ROWE
 4     Environmental and Natural Resources Division
       601 D Street NW, Suite 8000
 5     Washington, D.C. 20004
       202-514-3144
 6

 7   FOR DEFENDANTS LIPAR AND LGI:
       Haynes and Boone, LLP
 8     BY:   CASEY T. WALLACE
       1221 McKinney
 9     Suite 2100
       Houston, Texas 77010
10     713-547-2516
       713-236-5695(fax)
11

12   FOR DEFENDANTS VALERIANO and JTI:
       Fleming & Associates, P.C.
13     BY:   MICHAEL PAUL FLEMING
       440 Louisiana
14     Suite 1920
       Houston, Texas 77002
15     713-221-6800
       713-221-6806(fax)
16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. WALLACE:  This is Casey Wallace on behalf of Tom
 2   Lipar.
 3              THE COURT:  Is Michael Fleming somewhere?
 4              MR. FLEMING:  Yes, your Honor, I'm at an airport.
 5              THE COURT:  I'm using my phone.  We're both at public
 6   buildings.
 7              And, Mr. Rowe?
 8              MR. ROWE:  I'm here, your Honor.  I suppose I'm using
 9   my phone, too, although with some trepidation.  Last time we
10   were using our phone things didn't go so well for us.
11              THE COURT:  Well, it has to do with the behavior, not
12   the mechanical equipment.
13              MR. ROWE:  I understand.
14              THE COURT:  I want, and I want it done now, for the
15   agency to produce whatever it was that the highest level
16   operating person used to convince the administrator or anybody
17   else -- I don't know what the internal procedures are, but
18   somebody who has some sort of authority decided to sue Lipar.
19   And I want to know what that person's staff brought to them,
20   showed them, prepared for them that convinced that person, who
21   apparently is this woman somewhere, that she should ask the
22   justice department to sue Lipar.  And if it's six boxes of stuff
23   that they've took into her office and sat around and talked
24   about, I'm under no illusion that she read six boxes of stuff.
25   But there is somewhere an agency record of what she relied on or
```

1  none.  If the case is none, I just want her to tell me.
2  Arbitrary government is one of those things I'm familiar with.
3              MR. ROWE:  I understand, your Honor.  The purpose of
4  my filing the --
5              THE COURT:  The court reporter is easily confused.
6              MR. ROWE:  I beg your pardon.
7              THE COURT:  So please just give me your last name and
8  then speak.
9              MR. ROWE:  I'm sorry.  This is Mike Rowe for the
10 government, your Honor, and my apologies to the reporter.
11              Your Honor, I was about to explain that the
12 reason that I filed the motion the other week was because I was
13 a little bit uncertain about what your Honor had wanted me to do
14 at our most recent status conference where we were there with
15 your Honor in chambers, which, I think, is consistent with what
16 you said now except for one thing that I just want to get clear
17 with you and, I think, it cropped up again in your order last
18 week.  The process is essentially this:  The agency will conduct
19 an investigation for however long it generates probably 60 boxes
20 of documents, I don't know, lots of documents and lots of stuff.
21 When the agency is ready to refer a case to the Department of
22 Justice they prepare a referral memorandum, which we would
23 normally say is privileged but has been produced in the case.
24 That was the document I was referring to in the motion I filed
25 the other week.  And that document essentially provides to the

1  Department of Justice the information they have that they
2  believe justifies the lawsuit, which I think is what you're
3  looking for is additional by everybody and his brother before it
4  comes over here.
5          THE COURT:  No.  What I'm really looking for is not
6  the covering memorandum you send to con the lawyer -- not you --
7  the agency sends to con the lawyer --
8          MR. ROWE:  I guess I would be one of the lawyers being
9  conned in that scenario.
10         THE COURT:  Right.  Apparently it worked.  I want to
11 know what made that woman tell them, yes, prepare an authority
12 to sue because having considered all of these, there's got to be
13 something called a request for authority to sue or proposal for
14 administrative action.  This thing doesn't blossom as a lawsuit
15 six years into it.
16         MR. ROWE:  You're quite right.  I think we're talking
17 about the referral memorandum.  I mean, it's certainly true, as
18 with any kind of summary of evidence, that when you -- if I'm at
19 EPA and I'm asking the Department of Justice to bring the case,
20 I need to tell them why I think I have a case, what facts I
21 think I found out.  I mean, this is not a one-page cover memo,
22 it's a reasonably substantive piece and it has attachments that
23 talk about the wetlands and they have pictures in them.  It's
24 not quite as elaborate as what we brought to the Court the other
25 week because you asked for something more specific.  The only --

1  and I think your order last week said this would be okay if it
2  was what EPA relied upon to sue. And that's where the problem
3  comes, not because they didn't rely on this information to sue,
4  but because the referral from EPA to the justice department is
5  made in March of 2009, I believe it was. And quite often if I'm
6  the one being conned into bringing a lawsuit, although I wasn't
7  literally around in this particular instance, you know, the
8  justice department might have some questions, we might have some
9  more facts to develop. And in this instance a great -- your
10 Honor?
11           THE COURT: Yes, I'm here.
12           MR. ROWE: Okay. I thought I lost you.
13           In this instance a great deal of additional time
14 was spent developing the referral in a joint effort between the
15 department and EPA before the lawsuit was filed in May of this
16 year. So by the time the lawsuit is filed the agency has a good
17 bit more information to rely on than it had when it made the
18 referral. So if you were to say to me, "Give the referral a
19 reasonable representation of what EPA had and relied on in
20 making referral, asking the department to do," I think the
21 answer is yes. If you ask me whether our technical
22 representation was a fair representation of the relevant
23 technical data that the agency had -- the department had when it
24 sued in May of 2010, the answer is yes. But if you ask me
25 whether or not the referral a year before constitutes everything

```
 1   that the agency had when it brought the lawsuit in May of 2010
 2   after it knew all these initial things, the answer to that would
 3   be no.  And I --
 4          THE COURT:  So you're telling me after six years they
 5   referred it for litigation and only after close questioning by
 6   their counsel at justice did they develop the case they're
 7   presenting?  So they went off and found additional scientific
 8   and facts -- scientific data and on-the-ground facts between the
 9   time it was referred and the time they sued, is that what you're
10   telling me?
11          MR. ROWE:  Well, yes and no.  Yes, the things that you
12   said are true, there was more data developed on the ground, yes,
13   hard questions were asked, yes, people did site visits, yes, 308
14   requests for -- statutory information requests were asked and
15   answered thereafter.  So a lot of information was, in fact,
16   developed after the referral.  But I don't know that I would
17   agree that the agency had no case when it was referred.
18          THE COURT:  All right.  But that -- whether it has a
19   case now or then is not the point.
20          MR. ROWE:  Okay.
21          THE COURT:  The point is whether the defendant knows
22   what the case was supported by when the agency made its
23   decision.
24          Now, Mr. Rowe, I mentioned my friends at the
25   FDIC.  The authority-to-sue memorandum in no way included the
```

```
 1    background memoranda that circulated within the FDIC about
 2    extorting concessions from the defendant in completely unrelated
 3    environmental issues.
 4              MR. ROWE:  Yes.
 5              THE COURT:  And so that was the information that had
 6    been presented within the agency.  And then they did a sanitized
 7    let's make it all about the -- what we have some authority.
 8    Over and, as it turned out, even the private lawyers lied about
 9    the consultations in the exchange of drafts among the unrelated
10    civilian groups.
11              So they want to know if there's an
12    authority-to-sue memorandum addressed to Mr. Holder.  There is a
13    memorandum from a senior somebody to the person who has the
14    power to authorize the authority to sue proposing an authority
15    to sue.  Y'all don't start with one memorandum.
16              MR. ROWE:  Well, that's a question I can ask your
17    Honor, I believe I know that the answer to that is no.  In other
18    words, if, for example, you're suggesting that Mr. Harrington
19    would have written a memo to Sharon Parish, who's our wetland
20    chief, she's in Region 6, suggesting that he then prepare a
21    referral memo, I'm not aware of that.  There may be some e-mail
22    traffic telling him to do it, but the vehicle that provides the
23    internal review within the agency and that lays out the
24    evidence, they believe that they have, is the draft of the
25    referral memo, which -- and I'm sure it gets modified some way,
```

1  although I haven't -- I don't know that I seen one.  And they
2  look over it and they say, "Well, okay.  This part's fine.  Okay
3  I need this part.  This memo's fine, that will do the job."  And
4  various people up the chain will initial it.  Then it goes to
5  EPA headquarters and they look at it, see if they have any
6  problems and they initial it.
7              So it is the vehicle, the transporter, if you
8  will, of the case, and whatever evidence the agency has to
9  support it at the time.  So people, other than me, can look at
10 that referral memo and judge what they think or thought or would
11 have thought of the EPA in the case at the time it was referred.
12             THE COURT:  All right.  I understand that's your
13 supposition in normal practice.  I just want Parish to swear
14 factually --
15             MR. ROWE:  Okay.
16             THE COURT:  -- and specifically that there were no --
17 she saw nothing else until she saw the draft authority-to-sue
18 memo or whatever the first thing she saw about this.
19             MR. ROWE:  Yes, that's essentially what I understood
20 your order last week to say.  And so I talked to Mr. Wallace
21 last week.  I was prepared to --
22             THE COURT:  He can confuse anything.
23             MR. ROWE:  Well, I think he suggested that we give you
24 a call and it's better to have these things clear.  So if it
25 would be fair for me to construe your order clarifying last week

to say that you want Miss Parish to certify, in fact, that declaration, that this is really the basis for the lawsuit and that they, you know --

THE COURT: No. I want her to swear, not certify, I want her to swear --

MR. ROWE: Well --

THE COURT: -- in a simple declarative --

MR. ROWE: Okay.

THE COURT: Wait. Stop. I want her to swear in a simple declarative sentence that she considered nothing else directly or indirectly. There were no oral conversations, there were no e-mail traffic, she was presented by her staff with an authority-to-sue memorandum and that's all she knew and considered. And if that's not true, then what else and when else she did it. I just can't rely on your supposition of normal practice having occurred --

MR. ROWE: No.

THE COURT: -- assuming there is a normal practice.

MR. ROWE: I think I understand what you want. And my only concern about what you literally just said, your Honor, is that I suspect if I go and ask Miss Parish she will say, "Well, yes, that's what I relied on. I didn't rely on any of the sorts of things that your Honor is concerned about, but I can't swear that I didn't see some other map or something that we had in our possession in the course of looking at this thing before I got

1   the referral memo that I may have known about it" or something.
2         THE COURT: She just needs to do her best.
3         MR. ROWE: On the other hand, I think, we -- whatever
4   that material is, we have produced it to the defendants so --
5         THE COURT: But I need her to articulate what it is
6   that you produced that she had some familiarity with --
7         MR. ROWE: Yes.
8         THE COURT: -- or is likely to have.
9         All right. We've got to move on. I've got other
10  stuff scheduled.
11        On Request for Production 29, I do not understand
12  legislative history to be deliberative privilege.
13        MR. ROWE: Oh, your Honor, I think the other one's
14  harder. This one is strictly easy, I believe. I have talked to
15  folks this morning -- I haven't been involved, really, in any
16  detail with either of these things. But I did talk to folks
17  about them before this morning's call. It is my understanding
18  that there are no documents over which we are asserting
19  deliberative process privilege, that that was done at somebody's
20  suggestion here, which I will try to get, but at a time when --
21        THE COURT: Just give me the name and address and I'll
22  send a firing squad.
23        MR. ROWE: Okay.
24        THE COURT: There are only two answers to almost
25  everything. Government has a deliberative privilege and a top

1   secret stamp.
2           MR. ROWE:  Well, I'm sure that's true, but none of
3   this is top secret and there are no documents over which we are
4   asserting deliberative process.
5           THE COURT:  All right.  Well, then 36 and 29 need to
6   be done and done now.
7           All right.  Anything else?
8           MR. WALLACE:  We had a motion to compel documents
9   pursuant to Request No. 152 and the case -- in your case
10  management order of October 28 where the government was already
11  ordered previously to turn over documents that Jim Bench
12  mentioned in his e-mail.  And they have since replied with
13  another objection objecting to the production.
14          THE COURT:  Right.  I'm sorry, I covered that up.
15          Mr. Rowe, do it and do it now.  You know, it's
16  not sufficient to say that whatever that was that was referred
17  to has already been produced.  Identify it, have one of those
18  people connected to, swear.  But they have grounds for paranoia
19  when we start out with an e-mail that says, "We're not going to
20  give it to them, make the judge have a fit."  Well, I'll either
21  have a fit or you can just say I had a fit, it's your choice.  I
22  want that stuff produced.  I want a statement from the author of
23  that smarky letter and all the people related to it, I want
24  them, under oath, to commit in a simple declarative sentence
25  what it was that they were talking about.

```
 1                    All right.  I've got to go.  And I want that done
 2   this week.
 3           MR. ROWE:  Your Honor --
 4           THE COURT:  Yes, sir, whoever that is.  Who's this?
 5           MR. ROWE:  This is Mike Rowe again.
 6                    And I'm sorry to hold your Honor up, if you ever
 7   to go.
 8           THE COURT:  I've get to yell at other people.  You
 9   know, you're not the only person I get to entertain.
10           MR. ROWE:  Yes, sir.
11           THE COURT:  I just sit around here lonely hoping for
12   some company, hoping Rowe and Wallace will call me and fuss.
13           MR. ROWE:  Well, I don't want to fuss, but I do -- I
14   am concerned about this because I believe that Mr. Wallace is
15   construing this statement now, not as I was told he was before.
16   And I haven't had a chance to talk with him about it so I would
17   like to try to work it out with him.
18           THE COURT:  All right.  Talk to him.  But as I said
19   earlier, he can misconstrue anything so help him.
20           MR. ROWE:  I want to get them what they're supposed to
21   get.
22           THE COURT:  I don't think there's any way to
23   misconstrue the statement by the EPA or just whoever it was,
24   justice department guy, who says, "We're not going to follow the
25   rules, have him make us do it."  That's fairly clear.
```

1  MR. ROWE: And if that, indeed, was what he was
2  saying, which I don't think he was.
3  THE COURT: Well, that's what it says. You know,
4  that's the problem with written word, it says what it says, not
5  what he wants to explain it now.
6  All right. I've got to go. Talk to Wallace.
7  Y'all have a happy Thanksgiving, but get your
8  work done first.
9  MR. ROWE: Thank you.
10  MR. WALLACE: Thank you.
11  (Telephone conference ended at 11:02 a.m.)
12
13
14
15  I certify that the foregoing is a correct
transcript from the record of the proceedings in the
above-entitled matter.
16
17                                  /s/
                                    JEANETTE BYERS, RPR
18                                  December 1, 2010
19
20
21
22
23
24
25