IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-1904 |
| | § | |
| THOMAS E. LIPAR, et al., | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT[1]

1. Dismissal. Defendants Thomas E. Lipar, Lipar Group, Inc., LGI Land, LLC, LGI GP, LLC, LGI Development,[2] Jesse Valeriano, JTI Contractors, Inc., and JTI Construction, Inc. move for an order granting final summary judgment against Plaintiff, the United States of America, on all of Plaintiff's claims for relief under the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.* because there is no evidence that Defendants discharged pollutants into waters of the United States. Defendants also request that this Court award them all of their incurred attorneys fees and expenses.

2. Facts pertaining to wetlands.

   A. There is no evidence that any of the wetlands at issue have a continuous surface connection to a traditional interstate navigable water. (Ex. A at 464-68, 472-74, 477-78, 499; Ex. B.)

   B. The boundaries between the alleged wetlands and traditional navigable waters are easily distinguishable. (Ex. A at 466-68, 472-73.)

   C. There is no evidence of a significant nexus between any of the alleged wetlands and a navigable water. (Ex. C at 389-90.)

---

[1] Defendants are filing this Amended Motion for Summary Judgment to include record cites from the final versions of Mr. Herrington's February 17, 2011 deposition and Ms. Parrish's February 24, 2011 deposition. Final copies of both depositions have been substituted for the uncertified rough drafts as Exhibits A & C. Counsel assures this Court and opposing counsel that no other substantive changes have been made.

[2] While LGI Development joined in the Original Answer filed by all of the "Lipar Defendants," the Defendants specifically denied that LGI Development is a legal entity. See Docket Entry 12 at p. 3, ¶ 11. LGI Development is not a legal entity and has never conducted business in Texas, nor is it a partnership composed of the entities listed in the Complaint. No business entity exists that can be identified as LGI Development.

i. The United States has no scientific evidence that any of the alleged wetlands ever served the function of protecting the physical, chemical, or biological integrity of traditional navigable waters.  (Ex. A at 469-71; Ex. C at 389-90.)

ii. The United States has no scientific evidence that the purported impact to the alleged wetlands or tributaries affected the chemical integrity of traditional navigable waters.  (Ex. A at 468.)

iii. The United States has no scientific evidence that the purported impact to the alleged wetlands or tributaries affected the biological integrity of traditional navigable waters.  (Ex. A at 469-70.)

iv. The United States did not conduct site specific studies at any of the sites to determine groundwater fluctuations.  (Ex. A at 475.)

v. The United States has no gauge data for any of the alleged tributaries.  (Ex. A at 411-12.)

vi. The United States has no evidence that the alleged wetlands have ever prevented the flooding of traditional navigable waters.  (Ex. A at 458, 470-71.)

vii. The United States has no evidence of how much water the alleged wetlands are capable of storing either pre-disturbance or post-disturbance.  (Ex. A at 478.)

viii. The United States has no evidence of how many gallons of precipitation the alleged wetlands receive each year.  (Ex. A at 478.)

ix. The United States did not determine how much groundwater discharge or recharge base flow the relevant wetlands provide to the adjacent tributaries or navigable waters.  (Ex. A at 477.)

x. The United States performed no on-site testing to determine whether the pre-alteration wetlands could deteriorate nutrients.  (Ex. A at 475.)

xi. The United States did not implement a protocol for measuring the nitrogen attenuation capacity of the wetlands and wetland systems at the sites at issue.  (Ex. A at 475.)

xii. The United States did not study the order of temperature changes in any of the alleged wetlands.  (Ex. A at 477.)

xiii. There is no evidence that the alleged wetlands and tributaries' capacity to carry pollutants or reduce the amount of pollutants changed after the alleged impact.  (Ex. A at 478-79.)

      xiv. The water quality of the traditional navigable waters is the same as it was before the alleged impact occurred. (Ex. A at 476, 478-79.)

  D. The United States did not follow its own mandatory guidelines for determining whether the allegedly impacted areas are wetlands under the CWA. (Ex. A at 350, 443-44; Ex. D at 17-19, 137, 143, 157-58, 202-07, 270-71, 274; Ex. E at 43, 50, 159-64, 166, 260-61.)

      i. The EPA never performed a proper wetland determination on any of the alleged wetlands. (Ex. D at 141-42.)

          a. The United States did not determine the duration of on-site drainage. (Ex. A at 350.)

          b. The United States did not determine the frequency of hydrology. (Ex. A at 350-51.)

          c. The United States did not compare the soils, the vegetation, and the hydrologic conditions of the wetlands and upland areas. (Ex. A at 352.)

          d. There is no evidence of hydrophytic vegetation. (Ex. D at 202.)

          e. The United States did not perform an on-site analysis of the riparian and other buffer features around the purported water features. (Ex. A at 354.)

          f. The United States did not measure the flow of any of the alleged tributaries. (Ex. A at 411.)

          g. The United States has no gauge data for any of the alleged tributaries. (Ex. A at 411-12.)

          h. There is no evidence that there was a predominance of hydrophytic vegetation in any of the alleged wetlands prior to alteration. (Ex. D at 168-70, 200-01.)

      ii. A wetlands field delineation in accordance with government-mandated guidelines was never performed on any of the allegedly impacted wetlands. (Ex. A at 341-44; Ex. D at 205-07.)

3. Facts pertaining to non-navigable tributaries.

  A. There is no evidence that the tributaries at issue have a relatively permanent flow of water. (Ex. A at 501; Ex. D at 228-29.)

      i. There is no evidence that any of the alleged tributaries were perennial before the alleged impact.  (Ex. A at 420-21, 455-57, 498-99, 512.)

      ii. There is no evidence that any of the alleged tributaries were intermittent, as opposed to ephemeral, before the alleged impact.  (Ex. A at 420-21, 455-56, 498-99; Ex. D at 213-14.)

      iii. There is no evidence that any of the alleged tributaries are currently intermittent, as opposed to ephemeral.  (Ex. A at 432-33; Ex. D at 213-14.)

B. There is no evidence that the tributaries at issue are connected to traditional interstate navigable waters.  (Ex. A at 408-09, 464-65, 474, 487-88, 499, 503-06.)

C. There is no site-specific evidence that any of the tributaries have a significant chemical, physical and biological nexus to a navigable water.

      i. The United States never determined the volume, duration, and frequency of flow in the alleged tributaries or their relevant reach.  (Ex. A at 455-58.)

      ii. The United States never determined how often the capacity of any of the tributaries is actually reached.  (Ex. A at 458.)

      iii. The United States did not conduct site specific studies at any of the sites to determine groundwater fluctuations.  (Ex. A at 475.)

      iv. The United States did not determine how much groundwater discharge or recharge base flow the relevant wetlands provide to the adjacent tributaries or navigable waters.  (Ex. A at 477.)

      v. There is no evidence that any of the alleged tributaries performed a chemical function.  (Ex. A at 506.)

      vi. The United States did not conduct any site specific studies at any of the sites to determine the specific percent of organic content, carbon, nitrogen, sulfur, cation exchange capacity or PH.  (Ex. A at 475.)

      vii. There is no evidence that the alleged wetlands and tributaries' capacity to carry pollutants or reduce the amount of pollutants changed after the alleged impact.  (Ex. A at 478-79.)

      viii. The United States relies entirely on general scientific hypotheses to prove a biological connection between the alleged tributaries and traditional navigable waters; it has no site-specific scientific data to show a biological connection.  (Ex. A at 502-03, 506-07.)

    ix.    The United States did not do a macroinvertebrate aquatic insect study on the alleged tributaries. (Ex. A at 479-80.)

    x.    The water quality of the traditional navigable waters is the same as it was before the alleged impact occurred. (Ex. A at 476-79.)

D. The United States did not follow its own mandatory guidelines for determining whether the allegedly impacted tributaries are "waters of the United States" under the CWA.

    i.    The United States never determined the volume, duration, and frequency of flow in the alleged tributaries or their relevant reach. (Ex. A at 455-58.)

    ii.    The United States never determined how often the capacity of any of the tributaries is actually reached. (Ex. A at 458.)

    iii.    The United States did not conduct site specific studies at any of the sites to determine groundwater fluctuations. (Ex. A at 475.)

    iv.    The United States did not determine how much groundwater discharge or recharge base flow the relevant wetlands provide to the adjacent tributaries or navigable waters. (Ex. A at 477.)

    v.    There is no evidence that any of the alleged tributaries performed a chemical function. (Ex. A at 506.)

    vi.    The United States did not conduct any site specific studies at any of the sites to determine the specific percent of organic content, carbon, nitrogen, sulfur, cation exchange capacity or PH. (Ex. A at 475.)

    vii.    There is no evidence that the alleged wetlands and tributaries' capacity to carry pollutants or reduce the amount of pollutants changed after the alleged impact. (Ex. A at 478-79.)

    viii.    The United States relies entirely on general scientific hypotheses to prove a biological connection between the alleged tributaries and traditional navigable waters; it has no site-specific scientific data to show a biological connection. (Ex. A at 502-03, 506-07.)

    ix.    The United States did not do a macroinvertebrate aquatic insect study on the alleged tributaries. (Ex. A at 479-80.)

    x.    The water quality of the traditional navigable waters is the same that it was before the alleged impact occurred. (Ex. A at 476-79.)

4. Facts pertaining to attorneys' fees. This lawsuit was initiated in bad faith and without substantial justification.

5. Clean Water Act. The CWA prohibits discharging pollutants into "waters of the United States." 33 U.S.C. §§1311(a), 1362(7), 1362(12) (attached as Exhibit F). It does not impose liability over all waters, as that "would be a significant impingement of the States' traditional and primary power over land and water use." *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (quoting *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001)).

   A. In determining whether a wetland is a "water of the United States," the material issues, under the CWA, are whether the wetland either:

      i. is relatively permanent, with a continuous surface connection to a traditional interstate navigable water that makes it difficult to determine where the "water" ends and the "wetland" begins (*see Rapanos*, 547 U.S. at 742 (plurality test)); or

      ii. has a significant chemical, physical, and biological nexus to a navigable water, either alone or in combination with similarly situated lands in the region (*see id.* at 779-80 (Kennedy, J., concurring)). *United States v. Lucas*, 516 F.3d 316, 325 n.7 (5th Cir. 2008).

   B. In determining whether a non-navigable tributary is a "water of the United States," the material issues, under the CWA, are whether the tributary either:

      i. is a relatively permanent, standing or continuously flowing body of water that is connected to traditional interstate navigable waters (*see Rapanos*, 547 U.S. at 739, 742 (plurality test)); or

      ii. has a significant chemical, physical and biological nexus to a navigable water (*see id.* at 759 (Kennedy, J., concurring)).

   C. To show that either a wetland or non-navigable tributary has a "significant nexus" to a navigable water requires "substantial evidence" that is not speculative. *Id.* at 780, 786.

6. EPA's Procedures.

   A. Corps of Engineers Wetland Delineation Manual. The mandatory procedure for identifying and delineating wetlands potentially subject to CWA regulations is contained in the Corps of Engineers Wetland Delineation Manual, attached as Exhibit F. (*See* Ex. G at v, vii.) For the areas that are the subject of this suit to be identified and delineated as a wetland under the CWA, the following requirements must be satisfied:

      i. A wetland determination must be performed.

          a. A comprehensive determination is required in complex situations. (Ex. G at 61.)

          b. In an atypical situation, such as where there is sufficient natural or human-induced alteration to significantly change the area vegetation, soils, and/or hydrology, there must be sufficient evidence that hydrophytic vegetation, hydric soils, and/or wetland hydrology were present on the area prior to alteration. (Ex. G at 62.)

          c. There must be a predominance of hydrophytic vegetation in the area. (Ex. G at 6, 9-10, 12-13, 70-71, 74-77; *see* Ex. D at 201-02.)

          d. Hydric soils must be present. (Ex. G at 10, 71.)

          e. Wetland hydrology must be present and classified using the proper Data Form. (Ex.G at 10, 28-34, 70-71.)

      ii. A field delineation must be performed. (Ex. G at 9-10, 62; *see* Ex. D at 204-05; Ex. H.)

B. *Rapanos* Guidance Memorandum. After a wetland is properly identified and delineated, the EPA is required to make a jurisdictional determination. In making jurisdictional determinations under the CWA, the EPA is required to follow the *Rapanos* Guidance Memorandum, attached as Exhibit I. The EPA is also required to be thorough in documenting their jurisdictional determination and to use a standardized form.

      i. The EPA is required to make a significant nexus determination over the following types of water: (1) non-navigable tributaries that are not relatively permanent, (2) wetlands adjacent to non-navigable tributaries that are not relatively permanent, and (3) wetlands adjacent to, but not directly abutting, a relatively permanent tributary. (Ex. I at 7.)

      ii. When doing a significant nexus determination, the EPA is required to evaluate the flow characteristics and functions of the tributary itself in combination with the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical, and biological integrity of traditional navigable waters. (Ex. I at 8-9.)

      iii. When doing a significant nexus determination, the EPA is required to consider hydrologic factors including, but not limited to: (1) volume, duration, frequency of flow; (2) proximity to the traditional navigable water; (3) size of the watershed; (4) average annual rainfall; and (4) average annual winter snow pack. (Ex. I at 9.)

      iv.    When doing a significant nexus determination, the EPA is required to consider ecologic factors including, but not limited to: (1) the ability of tributaries to carry pollutants and flood waters to traditional navigable waters; (2) the ability of a tributary to provide aquatic habitat that supports a traditional navigable water; (3) the ability of wetlands to trap and filter pollutants or store flood waters; and (4) maintenance of water quality. (Ex. I at 10.)

7. Statutory authority for awarding attorneys' fees.

    A. The Declaratory Judgment Act, 28 U.S.C. § 2202, provides that "further necessary or proper relief based on a declaratory judgment … may be granted." Attorneys' fees may be awarded under 28 U.S.C. § 2202 when an action is filed in bad faith. *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988).

    B. The Equal Access to Justice Act, 28 U.S.C. §§ 2412(a) and § 2412(d)(1)(A), provides that attorneys' fees may be awarded when a lawsuit is initiated without substantial justification.

8. Conclusion. There is no evidence that Defendants discharged pollutants into "waters of the United States." The government initiated this action without substantial justification and in bad faith. Summary judgment should be granted, this action should be dismissed with prejudice, and the government should be ordered to pay Defendants' attorneys' fees and expenses.

        Respectfully submitted,

        */s/ Casey T. Wallace*
        Casey T. Wallace
        State Bar No. 00795827
        Federal I.D. No. 20117
        1221 McKinney, Suite 2100
        Houston, Texas 77010-2007
        Telephone: (713) 547-2516
        Facsimile: (713) 236-5695
        casey.wallace@haynesboone.com

        ATTORNEY-IN-CHARGE FOR
        DEFENDANTS THOMAS E. LIPAR;
        LIPAR GROUP, INC.; LGI LAND, LLC;
        LGI GP, LLC; and LGI DEVELOPMENT

OF COUNSEL:

Lawrence D. Finder
State Bar No. 07007200
Federal I.D. No. 602
Katharine D. David
State Bar No. 24045749
Federal I.D. No. 576771
HAYNES AND BOONE, LLP
1221 McKinney, Suite 2100
Houston, Texas 77010-2007
Telephone: (713) 547-2006
Facsimile: (713) 236-5520

*/s/ Michael P. Fleming*
Michael P. Fleming
State Bar No. 07130600
Federal I.D. No. 8767
440 Louisiana, Suite 1930
Houston, Texas 77002
Telephone: (713) 221-6800
Facsimile: (713) 221-6806
mfleming@flemingattorneys.com

ATTORNEY-IN-CHARGE FOR DEFENDANTS JESSE VALERIANO, JTI CONTRACTORS, INC., and JTI CONSTRUCTION, INC.

**CERTIFICATE OF SERVICE**

      I certify that on this 3rd day of March 2011, a true and correct copy of this document was served via electronic means through transmission facilities from the Court upon the parties authorized to participate and access the Electronic Filing System for the Southern District of Texas.

Ms. Heather E. Gange
 United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
E-mail:  heather.gange@usdoj.gov

Ms. Michele L. Walter
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
E-mail: michele.walter@usdoj.gov

Michael Rowe
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
E-mail: michael.rowe@usdoj.gov

                                              */s/ Casey T. Wallace*
                                              Casey T. Wallace

# EXHIBIT LIST

A - February 17, 2011 Deposition of Jim Herrington (final)

B - March 2, 2010 email to Michele Walter from Shannon Vallance (Parrish Depo. Ex. 16)

C - February 24, 2011 Deposition of Sharon Parrish (final)

D - November 30, 2010 Deposition of Jim Herrington

E - January 7, 2011 Deposition of Sharon Parrish

F - 33 U.S.C. §§ 1311, 1362

G - Corps of Engineers Wetlands Delineation Manual

H - February 6, 2008 email to Jim Herrington from Thomas Nystrom

I - *Rapanos* Guidelines Memorandum

H-881338.1