UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| United States of America, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | Civil Action H-10-1904 |
| | § | |
| Thomas E. Lipar, et al., | § | |
| | § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1.  *Introduction.*

The government sued a developer and his contractors for filling wetlands. Because the government cannot show that the wetlands were jurisdictional waters of the United States, it will take nothing.

2.  *Background.*

Thomas E. Lipar, among other things, is a real-estate developer. He and his companies – Lipar Group, Inc., LGI Land, LLC, LGI GP, LLC, and LGI Development – build residential housing developments. Though based primarily in Texas, Lipar and his affiliates build in Georgia, Arizona, and Florida.

Since 2004, Lipar has been developing tracts of land in north Houston. One tract is southeast of the Woodlands, between Spring Creek and the west fork of the San Jacinto River. It is called Benders Landing Estates. The other tract is northwest of the Woodlands, on the northwest tip of Windcrest Lake, near Magnolia, Texas. It is called Lake Windcrest.

Before it began clearing for Benders Landing, Lipar assessed the site and hired James Coody, a professional engineer, to opine about the land's coverage under the Clean Water Act. Coody advised Lipar that the Act did not cover the tract. He said it was well upstream of jurisdictional waters.

In 2007, Jim Herrington, an employee of the Environmental Protection Agency, visited the tract. He later spoke with Coody about the tract's coverage under the Act. In March, the Agency told Lipar in a letter to stop developing the tract. Herrington visited the site again in July, and the Agency administratively ordered Lipar to stop development in December.

Earlier in 2007, a consultant for the Agency – Science Applications International Corporation – reported about the tract's coverage under the Act. Coody asked for a copy of the report. The Agency refused. Coody requested a copy under the Freedom of Information Act, but it was denied.

Herrington visited the site a third time in January of 2008. In June, the Agency again administratively ordered Lipar to stop development. The second order mentioned violations in different locations than the first order.

On May 27, 2010, the United States sued Lipar, his companies, Jesse Valeriano, JTI Contractors, Inc., and JTI Construction, Inc., for violating the Act. It says that Lipar discharged fill into waters of the United States without a permit in eight locations in Bender's Landing Estates and at Lake Windcrest.

3.      *Jurisdictional Waters.*

The defendants say that the Act does not govern the areas that they developed. They say that the areas are not waters of the United States under the Act.

Traditionally, the government's power to regulate commerce extended only to those waterways which were accessible – navigable in fact – from a state other than those in which they lie.[1]

In 1972, the government enacted the Federal Water Pollution Control Act Amendments of 1972 which greatly expanded the Federal Water Pollution Control Act of 1948. These laws, together with further amendments in 1977 and 1987, have become known as the Clean Water Act.

Among other things, the Act prevents the discharge of dredge or fill into navigable waters – defined as the waters of the United States – without a permit. Waters of the United

---

[1] Gilman v. Philadelphia, 70 U.S. 713 (1865); *The Daniel Ball*, 77 U.S. 557 (1870).

States has been interpreted to include more than waters that are navigable in fact.[2] It, however, does not include every water or patch of mud tangentially connected to a navigable water. Nor does its reach extend to the impossibly broad and distant outer limit of the vogue interpretation of Congress's power to regulate commerce.[3]

When dealing with non-adjacent wetlands – wetlands that are adjacent to a water or wetland which is adjacent to a water that is navigable in fact – courts employ one of two tests from a plurality decision of the Supreme Court. The first – and the more restrictive test in this court's view – holds that wetlands are waters of the United States only if (a) an adjacent channel contains a water of the United States and (b) the wetland has a continuous surface connection with the water such that it is difficult to determine where the water ends and wetland begins.[4] The second test holds that wetlands are jurisdictional waters only if they possess a significant nexus to waters of the United States – waters that are navigable in fact and waters or wetlands adjacent to navigable waters.[5]

Because the wetlands at issue here meet neither test, this court need not decide which is more restrictive.[6]

A.      *Lake Windcrest.*

The government says that Lipar filled wetlands when it built Lake Windcrest. It says that the filled wetlands were jurisdictional waters of the United States because they had a continuous, surface connection to one or more of three tributaries that flow into Windcrest Lake. The lake, in turn through its spillway, flows into Dry Creek, which it says, at least seasonally flows into Spring Creek – in fact, it flows to Mill Creek, a tributary of Spring Creek. It says that Spring Creek is a traditionally navigable water. Alternatively, the government says that the wetlands have a significant nexus to Spring Creek.

---

[2] U.S. v. Riverside Bayview Homes, Inc., 474 U.S. 121, 139 (1985).

[3] Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159, 174 (2001).

[4] Rapanos v. U.S., 547 U.S. 715, 742.

[5] Id. at 782.

[6] Marks v. U.S., 430 U.S. 188 (1977).

To be navigable, a water must be susceptible of being used, in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes on water.[7] The court is not convinced that Spring Creek is navigable. During all but a flood, a craft of more than six-inches draft would likely not be able to navigate it. Though, perhaps, a canoe or kayak may be able to ply its waters, these recreational uses are not customary modes of trade and travel. A river boat, cargo ship, tanker, or other burdened vessel could not traverse it.

Assuming that Spring Creek is navigable, the wetlands about which the government complains are not sufficiently connected to it to be jurisdictional waters. Following the government's reasoning, Mill Creek is adjacent to Spring Creek, a navigable water. Dry Creek is adjacent to Mill Creek. Windcrest Lake is adjacent to Dry Creek. Three tributaries are adjacent to the lake. The wetlands about which it complains are adjacent to the three tributaries.

This regression is too tenuous. Mill Creek and Dry Creek, as the latter's name suggests, are little more than drainage ditches that conduct water only after a rain – a country boy could easily jump them. The same is true for the three tributaries. They are not permanent waters. The government's characterization as seasonal is generous and accurate only insofar as they are wet in the Spring and Fall after it has rained. They are wetlands only in the same way that the entire area is coastal prairie.

As even the government's environmental scientist – Peter Stokely – admits, there is no known, continuous surface connection from the wetlands to Spring Creek. The lake is dammed. Dry Creek is dry. The three tributaries flow intermittently. There is no difficulty determining where water ends and wetland begins.

The wetlands that were developed also bear no substantial nexus to waters of the United States. At best, they are part of the same watershed. This, however, is too broad. By the same logic, a storm sewer in Karen, Texas, is a jurisdictional water of the United States because the water it conducts eventually flows into Spring Creek. The government has nothing to show that the wetlands it complains about affect the chemical, physical, and biological integrity of Spring Creek or other waters farther downstream. It has nothing to show that fill discharged in the wetlands eroded and silted jurisdictional waters farther downstream, or something similar.

---

[7] *The Daniel Ball*, 77 U.S. at 563.

The wetlands that were developed in Lake Windcrest were not waters of the United States under the Act. The defendants needed no permit to fill them.

B.       *Benders Landing.*

The government says that Lipar and the other defendants filled wetlands in seven areas around the Benders Landing development. It has labeled each by letter A through G. Generally, it says that each area contained wetlands because each had hydrophytic vegetation, hydric soils, and ponded water. Each area, it says, is connected by tributaries to either Spring Creek or the west fork of the San Jacinto River – navigable waters according to it. The government relies on stream data from the United States Geological Survey, aerial photographs, topographical maps, national wetland inventory data from the United States Fish and Wildlife Service, and site inspections. The government admits that the national wetland inventory data is only about 50% accurate and that the soil maps were created for agricultural purposes, not wetland identification.

For the same reason as Spring Creek, the court is skeptical that the west fork of the San Jacinto River is navigable. Assuming that the development filled wetlands, and assuming that the west fork along with Spring Creek are navigable, the government has not shown that the wetlands Lipar and the others filled are jurisdictionally connected.

The government says that areas A and B flow through a tributary and into Tantrough Gully. The gully, in turn, flows to the west fork. Areas C and G flow through two other tributaries and eventually into the west fork. Areas D, E, and F all flow through other tributaries into Spring Creek.

The government's naturalists say that Tantrough Gully flows year round into the west fork. Each of the other tributaries, whether they flow to Spring Creek or the west fork, are intermittent. The government characterizes these intermittent flows as seasonal – that is, they drain the area after it rains.

Each area of wetland, the government says, has a continuous surface connection to the tributaries. These are conclusory legal generalizations. They are supported only by broad reference to the aerial photographs and topographical maps. What is more, they are belied by the naturalists themselves who attest that a continuous surface connection is, at best, a guess for some locations.

Assuming the government had proof, it does not matter. The seasonal connection of some wetlands to seasonal tributaries that feed navigable waters is too tenuous a connection to

give the government jurisdiction under the Act. Wetlands with only an intermittent, physically remote hydrologic connection lack the necessary connection to jurisdictional waters.[8]

The government fares no better under the significant-nexus test. It has no particular data about the impact that these wetlands have on the west fork or Spring Creek. Like before, general allegations that the area is part of the watershed are unavailing.

4.      *Sanctions.*

For ten years the government has investigated whether the two sites contained jurisdictional wetlands. It gathered data for five years before it sued. In ten years, the government has discovered no fact to show that the developed areas were jurisdictional wetlands.

Despite this, it has been intractable, uncooperative, and defiant.

A.      *Privilege.*

On July 6, 2010, this court ordered that the parties exchange disclosures and principal documents well ahead of the conference of July 29. Before the conference, the government produced three privilege logs. After a more detailed order, the government adjusted its privilege log. The adjusted log was 336 pages and claimed thousands of pages. After several reevaluations by the government – during which it discovered that 10% of the papers it originally claimed were not privileged, and that a quarter of 50 documents selected by Lipar were not privileged – the government submitted another revised log.

The court appointed a special master to review the log. Applying the Department of Justice's own privilege guidelines, the master found that 88% of all the pages claimed by the government were not privileged. He discovered that the government included documents from completely unrelated cases which bore no significance to this case.

B.      *Good Faith.*

Before it sued, the government thrice ordered Lipar and the other defendants to stop development. It threatened to fine them $32,500 per day. At that time, and when it later sued, it had not delineated where the wetlands that it contends were filled were located. It also had not determined, assuming there were wetlands, whether they were connected to a navigable water.

---

[8] *Rapanos*, 547 U.S. at 742.

It, then as now, relied on much the same information – aerial photographs, topographical maps, national wetland inventory data from the United States Fish and Wildlife Service, and site inspections. These data, at best, show that the developed areas were marshy, coastal prairie. None showed a continuous surface connection, or that the developed areas were somehow substantially linked to a navigable water.

The government's own papers suggest that it sued Lipar and the other defendants in part to discourage other companies from developing similar tracts in Houston. It disagreed with Lipar's interpretation of the United States Supreme Court's construction of the Act, and it was worried that other developers were aligning with Lipar's interpretation.

C.      *Disclosure.*

On September 10, 2010, this court ordered the government to produce the technical data it relied on to sue. After three months, three dodges, and a compelled deposition, it finally complied.

D.      *Rule 11, 37, and inherent power.*

The court may sanction a party when it has acted in bad faith in instituting proceedings or continuing them.[9] The court may sanction a party when it has failed to obey an order on discovery.[10] The court has inherent power to sanction parties who misbehave.

The government has not followed court orders or has done so only after months of recalcitrance. When ordered to produce data, it either did not comply or did so only half-heartedly. It has never followed the spirit of the court's orders, and, at best, it only sometimes complied with the letter. It has withheld papers under claims of privilege either maliciously or because it is grossly incompetent. It has abused its power in an attempt to brow-beat the defendants and discourage their colleagues and competitors from developing similar areas. Its behavior is reprehensible.

The court sanctions the government by requiring that it pay Lipar and the other defendant's reasonable attorney's fees which they incurred defending this suit.

---

[9] FED. R. CIV. P. 11.

[10] FED. R. CIV. P. 37.

5.   *Conclusion.*

The government has not shown that the wetlands it says that Lipar and the other defendants filled were jurisdictional waters of the United States. It will take nothing.

Because its conduct has been oppressive and dishonest, it must pay the reasonable attorney's fees incurred defending this suit.

Signed on August __30__, 2015, at Houston, Texas.


Lynn N. Hughes
United States District Judge